## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS RINKER,                          :

                                        :   **CIVIL ACTION NO. 3:15-1293**

    **Plaintiff**

                                        :          **(JUDGE MANNION)**

    **v.**

                                        :

SCOTT AMORI, ESQ., *et al.*,

                                        :

    **Defendants**

## <u>MEMORANDUM</u>

Pending before the court are the defendants' motions for summary judgment with respect to the remaining claims against them in plaintiff's second amended complaint, (Doc. 40), pursuant to Fed.R.Civ.P. 56. (Doc. 61, Doc. 66). Plaintiff's remaining claims are essentially professional negligence/legal malpractice and breach of contract based upon defendants' representation in a real estate transaction, a mortgage foreclosure action and related proceedings. Based upon the court's review of the relevant documents, the court will **GRANT** the motion of defendant Marsh and will **GRANT** Amori defendants' motion since it finds that there are no disputed material facts regarding plaintiff's remaining claims against these defendants.

## I.      PROCEDURAL BACKGROUND

The original plaintiffs, Thomas Rinker and Michelle Rinker, husband and wife, ("Rinkers"), filed the instant action alleging legal malpractice on June 30, 2015. (Doc. 1). The named defendants were Scott Amori, Esq., the law firm

of Amori & Associates, LLC, (hereinafter "Amori" defendants), and James
Marsh, Esq. ("Marsh"). John Does 1-10 were also defendants. It was alleged
that the court had subject matter jurisdiction based on diversity of citizenship
pursuant to 28 U.S.C. §1332. Plaintiffs alleged that they resided in New York
and that defendants were citizens of Pennsylvania. On August 7, 2015,
defendant Marsh filed a motion to dismiss the complaint pursuant to
Fed.R.Civ.P. 12(b)(6) arguing plaintiffs failed to state a claim for professional
negligence and punitive damages. (Doc. 7). An amended complaint was filed
by the plaintiffs on September 11, 2015. (Doc. 12). The Doe defendants were
terminated since they were not included as parties in the amended complaint.
The court also issued an order and dismissed defendant Marsh's motion to
dismiss plaintiffs' original complaint as moot. (Doc. 13).

On September 15, 2015, plaintiffs filed a Certificate of Merit under
Pa.R.Civ.P. 1042.3.[1] (Doc. 14). Counsel for plaintiffs certified that a licensed
professional has supplied a written statement that there is a reasonable basis
to conclude that the care, skill or knowledge exercised or exhibited by the

---

[1]Since plaintiffs are raising a professional malpractice claim under
Pennsylvania law against defendants, they were required to file a Certificate
of Merit ("COM") pursuant to Pa.R.C.P. 1042.3(a)(1). A COM is required for
a Pennsylvania professional negligence claim raised in a malpractice action.
*See* Frantz v. Fasullo, 2014 WL 6066020 (M.D.Pa. Nov. 13, 2014)
("Pennsylvania law requires a plaintiff alleging legal malpractice to file a
certificate of merit."). The Third Circuit has held that a COM is a substantive
rule and applies when a case is filed in federal court. *See* Liggon-Redding v.
Estate of Sugarman, 659 F.3d 258, 264-65 (3d Cir. 2011).
Mr. Rinker subsequently produced an expert report from Edwin P.
Smith, Esq. (Doc. 73-10). Amori defendants also submitted an expert report
from Jordan D. Cunningham, Esq. (Doc. 61-6).

defendants in the work alleged in the complaint fell outside of the acceptable professional standards and that this conduct caused the plaintiffs' alleged harm.

On September 30, 2015, defendant Marsh filed a motion to dismiss plaintiffs' amended complaint, (Doc. 15), and a brief in support, (Doc. 16). On November 13, 2015, after default was set aside, Amori defendants filed a motion to dismiss plaintiffs' amended complaint, (Doc. 31), and a brief in support, (Doc. 32). Plaintiffs were granted extensions of time to respond to defendants' motions. On December 15, 2015, plaintiffs filed a second amended complaint ("SAC"). (Doc. 40). Since plaintiffs' SAC was filed with consent of defendants' counsel and it superseded their amended complaint, the court dismissed the motions to dismiss plaintiffs' amended complaint. (Doc. 41).

Plaintiffs asserted three counts against all defendants in their SAC, to wit: Count I, professional negligence, malpractice and negligence; Count II, breach of contract and, breach of covenant of good faith and fair dealing; and Count III, loss of consortium. As relief, plaintiffs seek compensatory damages, including damages for emotional distress, as well as attorney's fees and costs.

On December 23, 2015, Amori defendants filed a motion to dismiss plaintiffs' SAC, (Doc. 43). They filed their brief in support with Exhibits on January 6, 2016, (Doc. 44). On January 13, 2016, defendant Marsh filed a motion to dismiss plaintiffs' SAC, (Doc. 45), and a brief in support, (Doc. 46).

Plaintiffs filed their brief in opposition to both motions to dismiss on

February 3, 2016. (Doc. 53). Amori defendants filed a reply brief in support of their motion on February 16, 2016. (Doc. 54).

The court issued a memorandum and order on March 22, 2016 regarding the motions to dismiss and, granted in part Amori defendants' and Marsh's motions.[2] (Doc. 56, Doc. 57). Specifically, the court dismissed plaintiff Michelle Rinker from this case with prejudice.[3] Amori defendants' motion to dismiss as to Rinker's claim against them in Count III of the SAC was granted, and this claim against these defendants was dismissed with prejudice. Amori defendants' motion to dismiss Rinker's claims against them in Counts I and II of the SAC was denied, and these claims against Amori defendants were allowed to proceed. Marsh's motion to dismiss Counts II and III of Rinker's SAC was granted and the claims in these counts as against Marsh were dismissed with prejudice. Rinker's claims contained in Count I of the SAC were allowed to proceed as against Marsh. Rinker's claims for emotional distress and for attorney's fees in his SAC were dismissed with prejudice. Also, the allegations in the SAC referencing "recklessness" were stricken since the punitive damages claim was dismissed.

On March 30, 2016, Amori defendants filed their answer to the SAC with affirmative defenses and exhibits. (Doc. 58). On April 15, 2016, Marsh filed his answer with affirmative defenses. (Doc. 59).

Following discovery, Amori defendants and Marsh filed motions for

---

[2]*See* 2016 WL 1110217 (M.D.Pa. March 22, 2016).

[3]Since Mrs. Rinker has been dismissed from this case, the court will hereinafter refer to the remaining plaintiff simply as "Rinker."

4

summary judgment. (Doc. 61, Doc. 66). Both motions have been fully briefed, (Doc. 63, Doc. 67, Doc. 73, Doc. 75, Doc. 76, Doc. 79), and statements of material facts, (Doc. 62, Doc. 68), as well as responses to both of them have been filed, (Doc. 74). Additionally, all parties have submitted exhibits regarding the motions. Rinker requested leave of court to file a sur-reply brief to defendants' reply briefs, and the court granted the request with a 5-page limitation. (Doc. 77, Doc. 78). On November 8, 2016, Rinker filed his sur-reply brief. (Doc. 79). As such, the summary judgment motions are ripe for review.

## II.   MATERIAL FACTS[4]

In 2008, Rinker executed a sale agreement to purchase a hotel, bar and restaurant ("subject property") in Monroe County, Pennsylvania, which he then operated with Jon Gilliland and Sable Machado. Subsequently, Rinker retained attorney Marsh to represent him in the sale of his Monroe County property to Gilliland and Machado, including the preparation of a personal mortgage on the property. Rinker did not have any written agreement with Marsh to draft the mortgage. Marsh then prepared the mortgage agreement for Rinker as part of the transaction for the sale of his property. The personal

---

[4]All of the facts are taken from defendants' statements of material facts, (Doc. 62), (Doc. 68), and plaintiff's response to them (Doc. 74), as well as the exhibits. Any statements or responses that do not address material facts, such as the pleadings, and which are legal conclusions or opinions are omitted.

mortgage was then held by Rinker as part of the agreement of sale.[5] Specifically, Rinker sold his business to Gilliland and Machado for $400,000 and Rinker maintained a $200,000 private mortgage on the property to secure the loan. Also, Rinker's private mortgage was a first lien on the property.

Before the closing on the sale of the property, Rinker received a copy of the mortgage Marsh drafted and reviewed it. After he reviewed the draft mortgage and before the closing, Rinker did not raise any questions or concerns, nor did he request any revisions or additions to it even after discussing the structure of the mortgage. Specifically, Rinker did not request Marsh to include a "rent provision" as part of the mortgage with respect to the property he sold to Gilliland and Machado ("the buyers"). Such a provision would have entitled Rinker to the monthly rental income from any tenants in the subject property if the buyers defaulted on their mortgage payments owed to Rinker. Marsh knew that the property had one tenant at the time he was preparing the mortgage and he spoke with Rinker about the apartments and the remaining tenant in the property before he drafted the mortgage. The other tenants in the property left around the time of the closing. Marsh did not believe that the rental of the apartments in the property was a pertinent issue regarding the sale of the property. Marsh has been an attorney for about 51 years and drafted commercial mortgages at least 50 times. Further, real estate law is one of Marsh's specialities. On the other hand, Rinker has a high

---

[5]The court previously took judicial notice that Mr. Rinker was the sole mortgagee with respect to the mortgage for the subject property which was recorded in the Monroe County Recorder of Deeds Office.

school education and served as a cook in the Navy before he got involved in running the family business at issue, which he then ran from 1988 to 2008, and was relying on his attorney for the sale of his Monroe County commercial property.

Following the closing, the buyers failed to satisfy their mortgage payments and fell delinquent. As such, in January 2011, Rinker retained Marsh to represent him in a mortgage foreclosure action he instituted with respect to the subject property in Monroe County Court of Common Pleas. Rinker did not have any written agreement with Marsh to commence the mortgage foreclosure action. At the time the foreclosure action was commenced, Rinker had destroyed all evidence and documentation regarding his records with respect to prior tenants as well as rental payments he received from the subject property. However, Rinker explained at his deposition that he did not have any such records because the relevant rental period was about eight years ago and he disposed of them.

Additionally, after the sale of the subject property, Rinker did not have any records to identify the number of tenants who were still in the property. Rinker also indicated that he thought most of the tenants had left the property immediately after the closing date. Specifically, at his deposition, when asked if there was any way he could state how many tenants or rooms were rented after he sold the property, Rinker responded "No, I cannot." Rinker did however state that after the sale, he believed the buyers planned to continue to rent the property and that the property earned about $3,000 per month from the five tenants beginning in 2011. (Doc. 61-4).

In 2013, Marsh obtained a judgment in the mortgage foreclosure action for the subject property in favor of Rinker. *See* Rinker v. Gilliland, No. 3620 CV 2012, Monroe County C.C.P. This was Marsh's final act of representation for Rinker for purposes of this case. Marsh could not carry on with Rinker's case any further because he became ill but he recommended attorney Amori to Rinker to continue with the case.

In August 2013, Rinker retained new counsel, Amori of the law firm of Amori & Associates, LLC, to provide him with further legal representation regarding the subject property, specifically, to enforce the judgment in mortgage foreclosure which Marsh had previously secured for him. Amori defendants had no prior involvement with Rinker's Monroe County foreclosure action. Amori was experienced in handling real estate matters, including litigation to set aside upset and judicial tax sales.

Rinker called Amori immediately and they met in person. On August 12, 2013, Rinker was sent a letter ("retainer agreement") in lieu of a formal fee agreement, with a signature line at the bottom, specifying that Amori would provide legal representation for him regarding "a private mortgage action" as they had discussed. (Doc. 61-4, Ex. 1, Doc. 73-4). Amori also specified his rates and the applicable work to which they would apply. Rinker was advised in an August 20, 2013 email that Amori had already entered his appearance in Rinker's private foreclosure action and sent the buyers default judgment notices. Rinker also stated that he believed that the foreclosure involved property tax and he was not sure if the foreclosure complaint Marsh filed for him against the buyers mentioned taxes since he testified he never saw the

complaint.

When Rinker met with Amori, he discovered that the property taxes due on the subject property were about $22,000. On August 27, 2013, Rinker paid Amori a $2000 retainer and admitted that Amori was to pursue a private foreclosure action for him. Rinker also stated that he was advised that the $2000 was a deposit to begin the foreclosure action and that Amori advised him following that action, "we'd have to pay the tax on it." Specifically, Rinker admitted that "[Amori] needed a $2000 deposit for the foreclosure action and [he (Rinker)] needed to pay the taxes." (Doc. 61-4, 34-35). However, Rinker also stated that he did not fully understand Amori's August 12, 2013 letter and he thought the $2000 retainer was "like a down payment" for Amori to handle the foreclosure action as well as the tax sale. (Doc. 61-4, 46-53).

On August 26, 2013, Amori entered judgment in favor of Rinker and against the buyers in the amount of $181,068.51. (Doc. 61-4, Ex. 5). On September 12, 2013, Amori filed a Praecipe for Writ of Execution. (Doc. 61-4, Ex. 6).

In early December 2013, Amori advised Rinker that an additional $2000 was needed from him to list the property for a Sheriff's mortgage foreclosure sale. Amori sent Rinker a letter on December 16, 2013 specifying this fact and asking Rinker to forward him the $2000. (Doc. 61-4 at 55-56 & Ex. 7).

On January 6, 2014, one of the buyers of Rinker's property, Machado, filed Chapter 7 bankruptcy and the automatic stay prevented Amori from listing the property for a Sheriff's mortgage foreclosure sale. In February 2014, Amori discovered that the property was going to be listed for a judicial

tax sale due to the outstanding $22,000 in taxes owed on the property and, in a telephone call, he advised Rinker of this tax sale and that the tax sale would eliminate Rinker's mortgage line on the property if the taxes were not paid before the sale. (Id.). Also, in light of Machado's bankruptcy petition, Amori filed a motion for relief of the automatic stay in the bankruptcy court and an order lifting the stay was issued on March 8, 2014. However, at the time the stay was lifted, the property had already been listed for judicial tax sale. Thus, Amori was unable to schedule the property for a mortgage foreclosure sale during the stated time period.

On March 17, 2014, Amori sent Rinker a letter clearly advising him that a judicial tax sale of the property was scheduled by the county in May 2014 due to the outstanding taxes owed on the property. (Doc. 61-4, Ex. 8, Doc. 73-5). Specifically, Amori's March 17, 2014 letter stated:

> The Judicial Tax Sale for Monroe County is scheduled for sometime in May 2014. The Judicial Sale is seeking to sell this property for the county taxes free and clear of your mortgage. You will need to make some arrangement with the Monroe County Tax Claim Bureau to stave off this judicial tax sale. I will move forward with the foreclosure action. If you have any questions, please feel free to contact me.

Rinker stated that he received the letter but he did not understand what the letter said. He stated that "[t]he way I understood [the letter] is when [Amori] bought the property back [at the sheriff's sale], I'd have to make arrangements to pay the [taxes with the] tax bureau." Rinker further stated that he did not call Amori to clarify the letter because every time he called Amori's office, Amori never called him back. (Doc. 61-4, 50-53).

Amori testified that since Rinker was the owner and a lien holder of the

property, he would have received more than one notice of the judicial tax sale directly from the county. Amori stated that he did not receive notice of either the tax sale or notice that the property was sold at the tax sale. Rinker points out that there is no evidence that he ever personally received any notice regarding the tax sale. Rinker also points out that even though Amori did not receive any notices, he knew of the tax sale as demonstrated by his March 17, 2014 letter.

After Rinker's property went to a judicial tax sale and sold to a third party, there was no reason for Amori to continue with his foreclosure action since there was no *rem* left for a foreclosure sale.

Rinker stated that he did not make an inquiry to find out what was required to try and save his property from the tax sale. In particular: Rinker did not contact the Monroe County Tax Bureau; he did not pay the delinquent taxes owed on his property; he did not attend the judicial tax sale; and he did not contact Amori for clarification. Additionally, Amori testified that after he sent Rinker the March 17, 2014 letter, he did not contact Rinker again since there was no need to.

There are not any writings showing any agreement between Rinker and Amori in which Amori defendants agreed to attend the judicial tax sale for Rinker or for them to pay the delinquent taxes on Rinker's behalf. In fact, neither Amori nor anyone from his office attended the tax sale. Further, Rinker received regular invoices from Amori defendants showing how his $2000 retainer was being used for work done regarding his foreclosure action. Amori's March 17, 2014 letter was his last contact with Rinker until the

11

present lawsuit was filed.

On May 21, 2014, Rinker's subject property was sold to a third party at a judicial tax sale after the outstanding taxes on the property were not paid. *See* Monroe County C.C.P. No. 453 Civil 2014. Rinker did not contact Amori to let him know that his property was sold at the tax sale. After the property was sold at the judicial tax sale, Rinker could no longer buy the property via a foreclosure sale as he had intended to do.

## III.  MOTION FOR SUMMARY JUDGMENT STANDARD

The defendants' motions for summary judgment are brought pursuant to the provisions Fed. R. Civ. P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 ; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)

(a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

Moreover, the Third Circuit indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.'" Goode v. Nash, 241 Fed. Appx. 868 (3d Cir. 2007) (citation omitted). A material factual dispute is one that may affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient

evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007); Watson v. Eastman Kodak Co., 235 F.3d 851, 858 (3d Cir. 2000) (the non-movant must establish the existence of each element on which it bears the burden of proof).

## IV.   DISCUSSION

Initially, all of Rinker's claims against Amori defendants in Counts I and II of the SAC remain. (Doc. 40). Specifically, professional negligence, malpractice and negligence claims in Count I and, breach of contract and breach of covenant of good faith and fair dealing in Count II. Only Rinker's claims contained in Count I of the SAC were allowed to proceed as against Marsh.[6] Essentially, the claims in Count I are tantamount to a claim of legal malpractice based on negligence, and the claims in Count II are tantamount

---

[6]Even though only Rinker's claims in Count I for legal malpractice grounded on negligence remain against Marsh, in his brief, (Doc. 67), Marsh addresses Rinker's breach of contract claim in addition to the malpractice claim.

to a claim of legal malpractice grounded on breach of contract.[7]

The court previously held that Rinker had standing to bring his remaining claims against the stated defendants. *See* Hess v. Fox Rothschild, LLP, 925 A.2d 798, 806 (Pa.Super. 2007), which held that "[t]o maintain a claim of legal malpractice based on negligence, a plaintiff must show an attorney-client or analogous professional relationship with the defendant-attorney." (citations omitted). The parties do not dispute that Pennsylvania law applies to Rinker's claims.

Amori defendants and Marsh move for summary judgment with respect to Rinker's remaining claims against them.

Marsh's motion and Rinker's claims against Marsh will be discussed first since these claims arose prior to plaintiff's claims against Amori defendants.

Marsh represented Rinker when the mortgage was prepared for Rinker's property and when the mortgage foreclosure complaint was filed. Rinker basically alleges that Marsh failed to include a rents provision in his property's mortgage which would have entitled him to receive about $3000 per month in rental income from the property beginning since 2011 if the purchasers defaulted on any mortgage payments to Rinker.

In Sokolsky v. Eidelamn, 93 A.3d 858, 862 (Pa.Super. 2014), the court

---

[7]In its March 22, 2016 decision, the court held that in Pennsylvania a legal malpractice claim can be brought under a contract theory as well as a tort theory. *See* Frantz v. Fasullo, 2014 WL 6066020, *3 (M.D.Pa. Nov. 13, 2014) ("Under Pennsylvania law, a client may bring both a contract action and a tort action against a professional.") (citations omitted). A plaintiff can bring both claims simultaneously. Gorski v. Smith, 812 A2d 683, 693 (Pa.Super. 2002).

stated, "[The Pennsylvania] Supreme Court has held that 'a legal malpractice action in Pennsylvania requires the plaintiff to prove that he had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a 'case within a case').'" (quoting Kituskie v. Corbman, 552 Pa. 275, 714 A.2d 1027, 1030 (1998)). To establish a legal malpractice claim, a plaintiff must satisfy a three-prong test. Id. This test was noted by the Third Circuit in Knopick v. Connelly, 639 F.3d 600, 606 n. 7 (3d Cir. 2011), wherein the court stated that a legal malpractice tort claim in Pennsylvania requires: "(1) the employment of the attorney or other basis for a duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of damage to the plaintiff." (citation omitted). *See also* Kituskie, 714 A.2d at 1029; Sokolsky, 93 A.3d at 862. "Moreover, the plaintiff's damage must be an 'actual loss rather than ... nominal damages, speculative harm or the threat of future harm.'" Sokolsky, 93 A.3d at 862-63 (quoting Kituskie, 714 A.2d at 1030). Plaintiff has the burden of proving by a preponderance of the evidence that he has sustained actual loss as a proximate result of the attorney's negligence. *See* Rizzo v. Haines, 520 Pa. 484, 499, 555 A. 2d 58, 65 (Pa. 1989). To establish actual loss, plaintiff has to prove that he would have prevailed in his underlying legal action but for his attorney's alleged negligence. *See* Myers v. Robert Lewis Siegle, P.C., 751 A.2d 1182 (Pa. Super. 2000).

It is undisputed that Marsh was retained by Rinker in 2008 to draft a

commercial mortgage regarding the subject property and that Marsh did not include a rent provision the mortgage allowing Rinker to recover rent payments upon default of the mortgage payments by the purchasers. The gravamen of Marsh's summary judgment argument is that Rinker has failed to establish an essential element of his legal malpractice claim against him since he did not demonstrate proof of his actual loss. Marsh argues that Rinker has failed to prove that the subject property was rented during the relevant time and that but for the lack of a rent provision, he would have received about $3000 per month in rent as of 2011. Specifically, Marsh points out that Rinker testified that he did not know if the property had any tenants at any time after he sold it to Gilliland and Machado, and that Rinker had no way of knowing how many tenants or rooms were rented after the sale and for how long. In fact, Marsh testified that at the time he drafted the mortgage for the subject property, there was only one tenant in the property and the buyers wanted him out. Marsh said when he discussed the mortgage with Rinker, the issue came up about his apartments, and Rinker "told me that they were dumps." He also stated that Rinker's main goal was "to get rid of his business" and that renting was not a topic of concern. (Doc. 73-6, at 12). Specifically, Marsh explained as follows why he did not consider adding a rent provision in Rinker's mortgage:

> the bottom line is the rental provision as far as these rooms [in Rinker's property] were concerned was moot. The rooms were trash. There was only one person [tenant] there. I don't know whether he [tenant] slipped him [Rinker] money under the counter or how he did it. But there was no real reason about this rental as far as we were concerned because these places were, you know, you get the health inspector in there and that would be the end of

it. But the thing is it was empty, so there was no real reason to go
into big wipe (sic) about that.

Additionally, Rinker testified that after he sold the property, he threw

away all of his records and tax filings regarding the renters that were in his

property when he owned it since they were several years old. As such, Marsh

contends that Rinker has not produced any evidence to support an award of

damages with respect to his claim against him. He also states that Rinker has

not produced any expert report regarding damages to the required degree of

legal certainty or provided any type of identification and calculation of his

alleged damages and is merely relying upon his own speculation.

Marsh further argues that Rinker failed to mitigate his damages since

he allowed the property to be sold at the judicial tax sale in May 2014 by

failing to pay the delinquent taxes. Rinker states, assuming arguendo, that

even if he did fail to mitigate his damages by not preventing the tax sale of his

property in 2014, he still would have lost about three years of rent prior to the

tax sale.

No doubt, an injured party has a duty to mitigate his damages. *See* VICI

Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 294 (3d Cir. 2014). As

discussed below, this issue is a moot point since the court is granting Marsh's

summary judgment motion.

There is no dispute that Rinker did not ask Marsh to include a rent

provision in his mortgage and Marsh did not include such a provision. (Doc.

73-1). The evidence is disputed as to whether Rinker read the mortgage at

the time it was drafted and filed by Marsh. Rinker stated that he first

18

discovered that his mortgage drafted by Marsh did not have a rent provision when a judgment was obtained for him in Monroe County Court in his mortgage foreclosure action. Rinker indicates that based on Marsh's extensive experience in real estate law, which was his speciality, and with drafting numerous commercial mortgages, including those with rent provisions, compared to his limited education and lack of business acumen, he was completely relying upon Marsh's legal expertise regarding the mortgage and its terms. As such, Rinker claims that Marsh breached his legal duty by failing to include a rent provision in his mortgage which he believes caused him to lose approximately $3000 per month in rental income from his property after the default by the buyers.

Additionally, Rinker's legal expert, attorney Smith, (Doc. 73-10, at 11), opines that "[t]here was no strategic advantage to not include a rent provision. The omission was not within Marsh's discretion as an attorney. This should have been an obvious exposure to an attorney with extensive experience in business and real estate law []." Further, Smith opines that "Marsh failed to exercise that degree of care, skill and knowledge required of attorneys in this Commonwealth in representing clients in this type of matter." (Id. at 7). Smith also simply repeats Rinker's unsubstantiated estimate of about $3000 per month regarding his damages due to the lack of a rent provision. Rinker did not produce any other expert to detail, in a specific fashion, the calculation of his damages and how they were derived.

The law is clear in Pennsylvania that "when it is alleged that an attorney has breached his professional obligations to his client, an essential element

of the cause of action, whether the action be denominated in assumpsit or trespass, is proof of actual loss." Duke & Co. v. Anderson, 275 Pa.Super. 65, 418 A.2d 613, 617 (1980); AS Tech Intern., LLC v. Husick, 676 F.Supp.2d 389, 402 (E.D.Pa. 2009) ("Pennsylvania courts have been very clear that plaintiffs in all malpractice actions must prove actual loss."). Also, just like all essential elements of a claim, the burden of proof is on the plaintiff to prove actual loss. Id. Moreover, damages must be proven by plaintiff with "reasonable certainty." *See* Rusiski v. Pribonic, 511 Pa. 383, 515 A.2d 507, 512 (Pa. 1984). Although the alleged damages need not be exact, the evidence presented should establish them "with a fair degree of probability." Exton Drive-In, Inc. v. Home Indemnity Co., 261 A.2d 319, 324 (Pa. 1969).

Rinker has failed to meet his burden by sufficiently proving with "reasonable certainty" his actual loss due to the lack of a rent provision in his mortgage drafted by Marsh. As detailed above, Rinker's speculative estimate regarding his damages, which lacks any evidentiary support, is well short of the required standard for proving actual loss with respect to his legal malpractice claim against Marsh. *See* Kituskie, 714 A.2d at 1030. (An essential element of a legal malpractice claim sounding in tort and in contract is "proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm.").

To summarize, Rinker admitted that he disposed of all of his records regarding his tenants and rental payments he had received from the apartments in his property. Also, when his property was sold, Rinker admitted that he did not have any information, documents or evidence to identify how

many tenants, if any, were in the property. He even conceded that he believed most, if not all, of the tenants had left his property immediately after the closing. He stated that to his knowledge, there was only one tenant after his property was sold. Indeed, Rinker admitted during his deposition that there was no way he could state how many tenants or rooms were rented out after he sold the property. (Doc. 75 at 8-10).

Additionally, Rinker offers no proof to support his contention that after he sold his property the buyers planned to rent the property, and he did not know how much the rent was with respect to any rooms that may have been rented out by the buyers. In this case, Rinker's uncertainty pertains to both the fact of damages was well as the amount. As such, Rinker's alleged damages are speculative. *See* Curran v. Stradley, Ronon, Stevens & Young, 361 Pa.Super. 17, 521 A.2d 451, 455 (1987) (It is plaintiff's burden of producing "sufficient evidence by which damages can be determined on some rational basis and other than by pure speculation and conjecture."). Further, Marsh would simply have no way to challenge Rinker's unsupported estimate that, after the sale, the subject property would have earned about $3000 per month beginning in 2011 and continuing until 2014. "The plaintiff bears the burden of presenting 'sufficient evidence by which damages can be determined on some rational basis and other than by pure speculation and conjecture.'" AS Tech Intern, 676 F.Supp.2d at 405 (quoting Curran v. Stradley, Ronon, Stevens & Young, 361 Pa.Super. 17, 521 A.2d 451, 455 (1987)).

Even if Rinker could show Marsh breached a professional duty, and the

21

court finds that he has not done so, such a breach with no resulting harm simply cannot support a legal malpractice claim. Kituskie, 714 A.2d at 1030.

Moreover, the court finds that Rinker has failed to demonstrate that Marsh's failure to include a rent provision in his mortgage breached his legal duty to exercise ordinary skill and knowledge when drafting the document. Based on the undisputed facts described above, and particularly the facts Marsh knew about the very poor condition of the apartments in the property with only one tenant left and the fact that Rinker did not even request such a provision after running the hotel, bar and restaurant on the property from 1988 to 2008, there was simply no reason for Marsh to include a rent provision in Rinker's mortgage.

In short, Rinker has failed to present sufficient evidence to create a genuine issue of material fact as to whether Marsh's alleged legal malpractice caused him actual loss of any rental income after the buyers defaulted on their mortgage payments owed to him, and as to whether Marsh breached his legal duty. "To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue," which Rinker has failed to do regarding his claim against Marsh. Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (citations omitted). Thus, based on the undisputed evidence, Marsh's summary judgment motion, (Doc. 66), will be **GRANTED** and judgment will be entered in Marsh's favor.

Next, the summary judgment motion of Amori defendants will be addressed.

22

The standard for a legal malpractice claim grounded on negligence with respect to Count I of the SAC is stated above and will not be repeated. In Count II, Rinker alleges that: "Defendants' aforementioned conduct constitutes a breach of the fee and other agreements, and the covenant of good faith and fair dealing, express, implied, and as a matter of law"; and "As a direct and proximate result of the aforesaid breach of the agreement, Plaintiff[] ha[s] been damaged ...." (Doc. 40, ¶'s 25-30). "Where a plaintiff pursues a legal malpractice claim under a breach of contract theory, the plaintiff bears the burden of proving: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." AS Tech Intern, 676 F.Supp.2d at 400 (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super.Ct. 1999)). "An essential element of a claim pursued under either theory is proof of actual loss." Id. (citations omitted).

Insofar as Rinker also indicates that he raises a breach of covenant of good faith and fair dealing claim against Amori defendants in Count II, (Doc. 74 at 1), the Third Circuit made clear that "under Pennsylvania law, the implied covenant of good faith does not allow for a cause of action separate and distinct from a breach of contract claim." Burton v. Teleflex Inc., 707 F.3d 417, 432 (3d Cir. 2013) ("[U]nder Pennsylvania law, a 'claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim.'") (citation omitted). As such, Rinker's claim that Amori defendants violated the duty of good faith and fair dealing in the performance of their representation agreement "is subsumed into [his] breach of contract

claim." Id. at 433. Since "[Rinker] cannot maintain an independent cause of action for the breach of the covenant of good faith and fair dealing under Pennsylvania law," Burton, 707 F.3d at 433, Amori defendants will be granted summary judgment on this claim.

The court in Frantz v. Fasullo, 2014 WL 6066020, *4, discussed a legal malpractice claim sounding in breach of contract and explained:

> In addition to the express provisions of an attorney-client agreement, "[a]n attorney who agrees for a fee to represent a client is by implication agreeing to provide that client with professional services consistent with those expected of the profession at large." Bailey [v. Tucker], 621 A.2d [108] at 115 [Pa. 1993]. Thus, absent allegations that the attorney failed to follow specific client instructions or breached a specific provision of their contract, a client's breach of contract claim against a lawyer "is not a true contract cause of action but sounds in negligence by alleging [that the attorney] failed to exercise the appropriate standard of care." Storm [v. Golden], 538 A.2d [61] at 65 [Pa.Super. 1988]; *see also* Edwards v. Thorpe, 876 F.Supp. 693, 694 (E.D.Pa.1995) ("[W]hen a plaintiff's cause of action is based on the attorney's failure to exercise due care, it will sound in contract only if the attorney fails to follow the client's specific instructions or, by her negligence, breaches a specific provision of the contract.").

*See also* New York Central Mut. Ins. Co. v. Edelstein, 637 Fed.Appx. 70, 73 (3d Cir. 2016) (the Pennsylvania Supreme Court in [Bruno v. Erie Insurance Company, 106 A.3d 48, 70 (Pa. 2014)] held "a claim sounds in negligence unless it is alleged that the party breached one of the 'specific executory promises which comprise the contract.'").

On August 12, 2013, Amori defendants sent Rinker a Retainer Agreement specifying that the legal services they would provide pertained to "a private mortgage action." Rinker stated that when he met with Amori, he paid a $2000 retainer requested in the agreement to Amori defendants.

Rinker testified that the retainer was for Amori to pursue the private foreclose action which Marsh had started for him. Rinker admitted that the letter did not mention any type of tax sale or an upset sale as part of the legal services Amori defendants were to provide for him. (Doc. 73-7, at 23-25). Amori then began working on Rinker's case to enforce the mortgage foreclosure judgment which Marsh had obtained.

In February 2014, Amori found out that Rinker's property was going to be sold at a judicial tax sale if the delinquent taxes owed were not paid. On March 17, 2014, Amori sent Rinker a letter specifically advising him to arrange with the Monroe County Tax Claim Bureau "to stave off the judicial sale scheduled for May 2014" so that he (Amori) could proceed to execute on the foreclosure judgment and hold a foreclosure sale to re-take the subject property. However, the taxes owed on the subject property were not paid and the property was sold at the tax sale to a third party. Rinker basically asserts that Amori defendants were at fault for allowing his property to be sold at the tax sale.

Amori defendants argue that Rinker's claims are based entirely on his allegation that Amori failed to advise him to pay the delinquent taxes for his property, i.e., negligence claim, and that Amori failed to purchase his property at the judicial tax sale, i.e., breach of contract claim. Initially, they point out that Rinker admitted that the $2000 initial deposit he paid Amori was only for the foreclosure action and that he needed to pay the delinquent taxes. In fact, as of November 1, 2013, the balance in Rinker's account from the $2000 retainer he had paid Amori defendants was only $813.33 and Rinker received

an invoice from defendants on this date reflecting their services rendered to date. (Doc. 61-4, Ex. 6). They also contend that the March 17, 2014 letter Amori sent Rinker clearly explained to Rinker that he had to address the "pressing matter" of the taxes owed on the property to stave off the May 2014 tax sale which would be free and clear of his mortgage. In fact, Rinker admitted in his deposition that the gist of Amori's letter "sounds like I should have paid the taxes and I would've had it [the property] back." Rinker stated however that he did not understand the letter, and that he read the letter to mean that when "he [Amori] bought the property back [at a Sheriff's mortgage foreclosure sale], I'd have to make arrangements to pay the tax bureau." Rinker also stated that "I don't think I read [the letter] the way it sounds...I don't think I read it the way it says." He further claimed that he did not understand the phrase "stave off the judicial sale." (Doc. 73-7 at 51, 53). But Rinker admitted that the March 17, 2014 letter did not mention the Sheriff's mortgage foreclosure sale and only referenced the "Judicial Tax Sale." (Id. at 53-54).

Amori defendants state that Rinker "did absolutely nothing to protect his own interest and/or follow the directives of [] Amori." (Doc. 63, at 13). In fact, Rinker never contacted anyone to discuss the letter, including, Amori, family members, another attorney and the Tax Claim Bureau. (Doc. 73-7 at 51-53, 73, 34-35). Also as the expert of Amori defendants, Cunningham, points out in his report, (Doc. 61-6), Amori's stated letter instructed Rinker to contact him if he had any questions. Thus, Cunningham opines that "Plaintiff [Rinker] has grossly failed to establish evidence that Amori Defendants breached any

standard of care in the representation of Plaintiff or that Plaintiff sustained any actual damages such that Amori Defendants are entitled to judgment as a matter of law." (Id. at 34).

Moreover, Amori defendants indicate that since a property owner and his agent can only bid the full amount of the taxes owed on his property at a tax sale and since Rinker owed about $22,000 in taxes, the additional $2000 that Amori told Rinker he needed to schedule the Sheriff's mortgage foreclosure sale clearly was not for Amori to buy back Rinker's property at the judicial tax sale. Further, Rinker never even paid Amori the additional $2000 to schedule the Sheriff's mortgage foreclosure sale. Amori defendants also indicate that the invoices Rinker was receiving from them, which he admittedly read, showed that the work they were doing for him pertained only to his mortgage foreclosure action. (Doc. 73-7 at 41). In fact, this is precisely why Amori advised Rinker in the March 2014 letter to make arrangements with the Tax Claim Bureau to satisfy the delinquent taxes.

Further, Amori defendants state "what is even more compelling is the fact that Plaintiff cannot produce one document, one email, one communication or one person to support his contention that Amori Defendants were purchasing the property [at the tax sale] on behalf of Plaintiff for $2,000" even after this court allowed Rinker in its previous memorandum to conduct discovery on this issue. (Doc. 63 at 17).

Finally, Amori defendants contend that Rinker has failed to establish actual damages with respect to all of his claims against them.

"[I]n interpreting an agreement, the court must ascertain the intent of the

parties." Kripp v. Kripp, 578 Pa. 82, 90, 849 A.2d 1159, 1163 (2004) (citation omitted). If the agreement is written, "the intent of the parties is the writing itself." Id. "When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." Id. (citation omitted). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Id. at 91. "[U]nambiguous contracts are interpreted by the court as a matter of law." Id.

Rinker's testimony regarding his alleged misunderstanding of Amori's March 17, 2014 letter is a tortured reading of the letter, which is clear and unambiguous on its face.

Amori's letter, in pertinent part, specifically advised Rinker as follows:

> The judicial tax sale from Monroe County is schedule for sometime in May 2014. The judicial sale is seeking to sell the property for county tax fees or taxes free and clear of your mortgage. You will need to make some arrangement with the Monroe County Tax Claim Bureau to stave off the judicial tax sale.

As mentioned, Rinker testified that when he read the above paragraph, "I don't think I read it the way it says. The way I understood it is when he [Amori] bought the property back, I'd have to make arrangements to pay the tax bureau." Amori also advised Rinker in the letter that the Monroe County tax judicial sale seeking to sell his property for the county taxes free and clear of his mortgage was scheduled for sometime in May 2014, and Rinker admitted that "[the letter] sounds like I should've paid the taxes and I would've had [the property] back." Nonetheless, Rinker stated that he did not understand what the letter said. Nor did Rinker call or talk to anyone at all to

28

explain the letter. (Doc. 73-7 at 49-53).

It is simply incredulous that Rinker did not understand the clear and unambiguous letter Amori sent him and for Rinker to believe that the additional $2000 needed to schedule the Sheriff's mortgage foreclosure sale was for Amori to buy back his property at the tax sale. This is especially true since it is undisputed that Rinker never paid Amori the additional $2000. Also, Rinker's explanation why he did not try and contact Amori about the meaning of the letter, i.e., Amori did not return his prior calls, does not address why he failed to contact anyone to discuss the letter, or why he failed to ever directly contact the Tax Claim Bureau as Amori advised him to do. Amori defendants state, (Doc. 63 at 20), "Plaintiff's entire breach of contract claim is based upon his 'belief' that Attorney Amori failed to purchase the property at sheriff's sale/tax upset sale (breach of contract)", however, "Plaintiff has been unable to establish beyond his own belief that there was some explicit agreement or instruction that attorney Amori allegedly breached." They also state, (Doc. 76 at 5), "Plaintiff's claim of 'not understanding' the undisputed and un-contradicted letter is not sufficient evidence to defeat a properly pled motion for summary judgment." Moreover, in its prior memorandum, the court allowed Rinker to conduct discovery to rebut the March 2014 letter and he failed to produce any evidence to contradict the letter.

Rinker's liability expert, attorney Smith, opines that "[b]ut for the Amori's malpractice in not clearly explaining the implications of the judicial tax sale to Plaintiff, Plaintiff would have retained the subject property." (Doc. 73-10 at 5). Smith also opines "Amori had a duty to fully explain the interplay between the

tax matter and the foreclosure matter to Plaintiff. Instead, Amori sent Plaintiff a brief letter with a cursory mention of the tax sale. []. Amori never followed up with Plaintiff and never verbally communicated with Plaintiff about this issue." (Id. at 8). Smith concludes that "defendant Amori failed to exercise that degree of care, skill and knowledge required of attorneys in this Commonwealth representing clients in this type of matter." (Id. at 9). The law is clear that experts can provide an opinion about the ultimate issue in a case, but may not give an opinion tied to any legal conclusion, such as whether a defendant was negligent. Patrick v. Moorman, 536 Fed. App'x 255, 258 (3d Cir. 2013) (citing Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006); United States v. Leo, 941 F.2d 181, 196–97 (3d Cir. 1991)).

The expert of Amori defendants, attorney Cunningham, (Doc. 61-6 at 34), opines that his review of the facts in the record, "as concerns Defendant Amori's representation of Plaintiff Rinker's interests in the mortgage foreclosure action, reflects he exercised that degree of care, skill, and knowledge required of attorneys in representing clients in similar circumstances." He also explains why Rinker's testimony that he thought Amori was going to attend the tax sale for him and buy back his property was inconsistent with the facts in the record as well as Rinker's own testimony. Specifically, Cunningham, (Id. at 34-35), states:

> Rinker contacted Amori in early [December] 2013 and knew that an additional $2,000.00 was needed in order to list the Property for a Sheriff's mortgage foreclosure sale. This fact was memorialized in Amori's correspondence of December 16, 2013. [Doc. 73-7, Ex. 7] In February 2014, Rinker was advised by Amori in a telephone conference that the judicial tax sale would potentially eliminate his mortgage lien on the Property if the

outstanding $22,000.00 of delinquent taxes were not paid prior to the judicial tax sale [Doc. 73-7 at 55-56]; knew or should have known that his mother had never paid the $2,000.00 deposit to schedule the Sheriff's mortgage foreclosure sale; knew he had never received any correspondence from Amori that he would attend the judicial tax sale; knew he had been advised on March 17, 2014 that he needed to contact the Monroe County Tax Claim Bureau to make arrangements to pay the delinquent taxes; and knew that if he had any questions about the contents of the March 17, 2014 correspondence, to contact Amori. [party titles omitted]

The undisputed facts of this case show that Amori defendants simply did not breach any duty in the December 2013 and the March 2014 letters since they did not make a specific promise that they would attend the judicial tax sale of Rinker's property in May 2014 for him, and buy the property back in order to prevent it from being purchased by a third party. As explained above, the additional $2000 that Amori told Rinker he needed in December 2013 was only to list the property for the Sheriff's foreclosure sale and it had nothing to do with the judicial tax sale in May 2014. In fact, in December 2013, neither Rinker nor Amori knew that the property was going to be listed for a judicial tax sale in May 2014 due to the delinquent property taxes. Indeed, the property was not listed for judicial tax sale until January 23, 2014. Rinker did not find this out until February 2014 when Amori told him in a telephone call and advised Rinker that the judicial tax sale would eliminate his mortgage lien on the property if the delinquent taxes of $22,000 were not paid before the sale. (Doc. 73-7 at 55-56).

Moreover, it is undisputed that Rinker never paid Amori the additional $2000 he requested in his December 16, 2013 letter and a Sheriff's mortgage foreclosure sale was never scheduled even though Amori filed a Writ of

31

Execution on September 12, 2013 to schedule such a sale since he needed the $2000 to schedule the sale. (Doc. 73-7, Ex. 7). As Cunningham concludes in his report, (Doc. 61-6 at 38), Rinker's "allegation that Amori beached a contractual obligation by failing to attend a Sheriff's mortgage foreclosure sale and acquiring the Property is based upon a premise or an event that never occurred." As such, the August 2013 retainer agreement Amori sent to Rinker was only for Amori to provide legal representation for Rinker's mortgage foreclosure action and there was no agreement in the record of this case showing that Amori was also providing Rinker with representation with respect to the May 2014 judicial tax sale. Further, Amori did meet his legal duties owed to Rinker with respect to the mortgage foreclosure action, which he was retained to do, namely, after the mortgage foreclosure judgment was obtained, he executed a writ of execution against the property to secure Rinker's interest in it and, he obtained relief from the automatic stay when one of the buyers (Machado) filed a Chapter 7 bankruptcy petition so that the foreclosure action could continue, including being able to pursue the scheduling of a Sheriff's mortgage foreclosure sale.

Thus, there was no "specific executory promise" in the letters that Amori defendants breached and thus, they are entitled to summary judgment with respect to Rinker's malpractice claim agaisnt them sounding in contract. Nor is there any evidence that Amori defendants breached any standard of care in their legal representation of Rinker since Amori clearly advised Rinker to take care of the outstanding taxes on his property to avoid the tax sale well in advance of the sale and since Rinker never followed up on the letter by

contacting anyone about the matter or by heeding Amori's advice and paying the delinquent taxes. Thus, Amori defendants are entitled to summary judgment with respect to Rinker's malpractice claim against them sounding in tort.

As such, Amori defendants' motion for summary judgment, (Doc. 61), with respect to Rinker's legal malpractice claims sounding in both tort, Count I, and contract, Count II, is **GRANTED** and, judgment will be entered in favor of Amori defendants and against Rinker regarding these claims.

Finally, in his sur-reply brief, Rinker belatedly requests leave of court, after discovery has been completed and the deadlines to file expert reports as well as supplements have passed, to try and retain a damages expert witness and to submit a damages expert report claiming that the four *Meyers* factors weigh in favor of allowing his additional post-discovery expert.[8] (Doc. 79). *See* Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904–05 (3d Cir. 1977), *overruled on other grounds*, Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985).

No doubt that Rinker failed to timely submit a damages expert report in

---

[8]The court notes that the discovery deadline in this June 30, 2015 case was May 31, 2016, and the expert report deadline was June 30, 2016 for Rinker and July 31, 2016 for defendants. Supplementations were due by August 15, 2016. Expert discovery was to be completed by September 15, 2016. (Doc. 55). Also, Rinker was granted a total of three extensions of time to file his opposition briefs to defendants' summary judgment motions dating back to August 23, 2016, and he never once raised the issue regarding lack of a damages expert despite seeing the arguments in defendants' briefs on this issue.

this case. "When a party fails to provide information as required by Rule 26(a), Rule 37(c)(1) provides that 'the party is not allowed to use that information or witness to supply evidence ... at trial, unless the failure was substantially justified or is harmless.'" Klatch-Maynard v. Sugarloaf Tp., 2011 WL 2006424, *2 (M.D.Pa. May 23, 2011) (citing Fed.R.Civ.P. 37(c)(1)). "The non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless." Id. (quoting Tolerico v. Home Depot, 205 F.R.D. 169, 175 (M.D.Pa. 2002)). In fact, in his sur-reply brief, Rinker does not even address these two initial conditions to justify his failure to comply with Rule 26(a)(2)(B), rather, he only addresses the four *Meyers* factors.

The proper way to proceed is for the court to first determine if Rinker has met his burden of proving substantial justification or harmlessness for his failure to comply with Rule 26(a)(2)(B), and if he has not, then the court has discretion to exclude his proposed damages expert pursuant to Rule 37(c)(1). "In determining whether to exclude evidence as a sanction for failure to comply with a discovery order, the Court must consider the following factors: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) bad faith or willfulness in failing to comply with the district court's order." Klatch-Maynard, 2011 WL 2006424, *3 (citing Meyers, 559 F.2d at 904–05).

Even though the court finds that Rinker has failed to meet his burden of proving substantial justification or harmlessness, the court does not need to address the four *Meyers* factors since it is not going to exclude his proposed damages expert pursuant to Rule 37(c)(1). Rather, the court finds that the proposed damages expert, even is permitted, would have no bearing on the outcome of the defendants' motions for summary judgment.

Since the granting of Amori defendants' motion for summary judgment is not based on Rinker's failure to establish actual damages with respect to his claims against them, his present request for an extension of time to try and retain a damages expert does not apply to these defendants. Indeed, in his sur-reply brief, Rinker did not address any of the deficiencies regarding the merits of his claims which Amori defendants persuasively argued in their briefs. Rather, Rinker's request is only applicable to Marsh since Marsh's motion is being granted, in part, based on Rinker's failure to prove actual damages with respect to his legal malpractice claim sounding in tort. Marsh's motion however is also being granted because the undisputed facts show that Marsh did not breach his legal duty owed to Rinker by failing to include a rent provision in Rinker's mortgage. As such, since the undisputed evidence demonstrates that Rinker's claims as against all defendants fail based on liability, Rinker's request for leave of court to conduct supplemental discovery in order to try and retain a damages expert, (Doc. 79), is **DENIED AS MOOT**.

Insofar as Marsh's motion is being granted based on Rinker's failure to prove actual damages, the court finds that the record in this case bears insufficient facts for a damages expert to reach a reliable opinion regarding

35

damages caused by the lack of the rent provision in Rinker's mortgage since Rinker did not have any documents or records regarding tenants and rent in the apartments located in his property. No matter how much supplemental discovery may be allowed, this fact simply will not change. "Federal Rule of Evidence 702, [], imposes an obligation upon a district court to ensure that expert testimony is not only relevant, but reliable." *See* ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291 (3d Cir. 2012) (citations omitted). The Third Circuit has made clear that "the reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." Id. Also, an expert must rely on facts in the record to support his opinion and there are no facts in the record of this case, as detailed above, to substantiate any claim that Rinker suffered actual damages based on Marsh's conduct. Id. at 290.("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.") (citations omitted).

Thus, Rinker's request for leave of court to conduct supplemental discovery and obtain a damages expert witness, (Doc. 79), is **DENIED**.


## V.    CONCLUSION

Based on the foregoing, Marsh's motion for summary judgment, (Doc. 66), with respect to Rinker's claim contained in Count I of the SAC, (Doc. 40), is **GRANTED**. Amori defendants' motion for summary judgment, (Doc. 61),

regarding all of the claims against them in Counts I and II of Rinker's SAC, (Doc. 40), is **GRANTED**. Rinker's request for leave of court to conduct supplemental discovery and obtain a damages expert witness, (Doc. 79), is **DENIED**. An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Dated: November 22, 2016**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-1293-02.wpd